1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   ROBERT C. NAWI,                              No. C 07-00261 SI
9              Petitioner,                       **ORDER DENYING PETITION FOR**
                                                 **WRIT OF HABEAS CORPUS**
10     v.
11  R. EVANS, Warden,
12             Respondent.
    _____/
13
14                              **BACKGROUND**

15       On August 27, 2001, a jury found petitioner Robert C. Nawi guilty of first degree murder, Cal.

16  Penal Code § 187, and found that he used a deadly weapon, an ice pick, in the killing of Virginia

17  Lowery,  Cal. Penal Code § 12022(b)(1). First Amended Petition for Writ of Habeas Corpus (FAP) at

18  6; Memorandum of Points and Authorities in Support of Answer (Support of Amended Answer) at 1.

19  On October 4, 2001, the trial court sentenced petitioner to a term of 26 years to life in imprisonment.

20  Petitioner appealed, and the California Court of Appeal affirmed on December 21, 2004.  Petitioner's

21  timely petition for review in the California Supreme Court was dismissed and remanded to the Court

22  of Appeal on August 21, 2006.

23       Petitioner filed a timely *pro se* habeas corpus petition in this Court on January 16, 2007.  On

24  February 25, 2008, petitioner's motion for a stay to exhaust all state claims pursuant to 28 U.S.C.

25  § 2254(b)(1)(A) was granted. On November 7, 2007, petitioner filed in the Superior Court for the City

26  and County of San Francisco, a petition for writ of habeas corpus which was denied on the merits on

27  March 10, 2008.  On June 16, 2008, petitioner filed his habeas petition in the Court of Appeal.  It was

28  denied on July 1, 2008.  On July 20, 2008, petitioner filed his habeas petition in the California Supreme

1   Court.  It was denied on February 11, 2009.  Having exhausted all state claims, petitioner's motion to

2   lift the stay in this Court was granted on March 13, 2009.

3       The facts of the case are taken from the Court of Appeal opinion in *People v. Nawi*, No.

4   A096635, 2004 WL 2944016, *1 (Cal. Ct. App. Dec. 21, 2004).

5   **The 1987 Murder**

6   On Thursday, October 29, 1987, the police responded to an anonymous telephone report of a
    robbery and possible murder at 966 Brussels Street in San Francisco. The caller was an older
7   male with an undistinguished voice. The police discovered the body of Virginia Lowery on the
    floor of the garage of her home. She had been stabbed 34 times with an ice pick in the head,
8   neck, and upper body and had been killed at least a day or more earlier, possibly as early as
    Sunday, October 25. There were no signs of a struggle, and the medical examiner concluded
9   Virginia Lowery may have been knocked out and then stabbed.

10  The police met with Virginia Lowery's sisters and brother at the Brussels Street house to see if
    anything seemed out of place. The rooms did not appear to be ransacked or disturbed. Virginia
11  Lowery's curio cabinet containing art pieces and collectibles was intact. Her purse with money
    inside was on the sofa. Her jewelry boxes were undisturbed. And jewelry worth hundreds of
12  thousands of dollars was still in the safe. Her Cadillac was in the garage.

13  There were no signs of forced entry. The front door was locked. Virginia Lowery often left the
    sliding glass door from the living room to the deck partially open to let in fresh air, and that door
14  was found slightly ajar. The screen door was locked, but the screen was slightly pulled away
    from the frame beside the lock. Virginia Lowery's back neighbor later reported that a portion
15  of her adjoining fence was broken as if someone jumped over the fence into Virginia Lowery's
    backyard.
16
    Virginia Lowery had apparently been ironing clothes when she was attacked. An ironing board
17  was set up in the garage and an iron was found on the floor with its cord cut. The cord from the
    iron was wrapped around Virginia Lowery's neck.
18
    Virginia Lowery's sister talked to her on Sunday evening, October 25, and invited her to dinner.
19  Virginia declined the invitation and said she was ironing. She did not answer her telephone after
    that. She did not show up on Monday, October 26, to volunteer at her grandniece's school.
20
    Virginia Lowery was married to William Lowery, who was a convicted robber and an admitted
21  heroin dealer living in Mexico. He had moved there in 1984 in order to avoid drug enforcement
    authorities. Virginia Lowery was about two years away from retirement and planned to move
22  eventually to Mexico to join her husband. After being notified of his wife's death, William
    Lowery returned to San Francisco on Friday, October 30, 1987. During interviews with the
23  police, he reported that his wife's jewelry box was missing along with a gun. The police did not
    believe that there had been a theft.
24
    By all accounts, Virginia Lowery was fastidious and kept herself and her house immaculate. The
25  police found the garage to be inordinately clean. The car and the water heater had only a very
    fine layer of dust on them. However, the police located latent fingerprints on the left rear and
26  right rear bumper of Virginia Lowery's car near the body. More fingerprints were found on the
    side of the water heater, even closer to the body. The identity of the fingerprints could not be
27  determined at the time, but the latent prints were stored in a computer database for unsolved
    crimes. Over 10 years after the murder, in April 1998, a San Francisco police technician
28  discovered that the latent prints lifted from Virginia Lowery's water heater matched the

United States District Court
For the Northern District of California

fingerprints of defendant, who had been arrested that month in San Francisco at the request of a bartender.

**The 1988 Drug Investigation**

In 1988-within a year after Virginia Lowery's murder-defendant was arrested on federal drug charges under the name Robert Wells, aka Sam Zanca. He pled guilty, and was sentenced to 10 years in federal prison. The San Francisco homicide investigators were unaware at the time of the investigation by the federal Drug Enforcement Administration (DEA), but the connections to the murder of Virginia Lowery later came to light.

The events leading to defendant's drug conviction are as follows: On August 13, 1988, defendant's wife was stopped for erratic driving. She identified herself as Wendy Dietzel and said her husband was Sam Zanca. She was driving Virginia Lowery's brown Cadillac and had a pink slip showing transfer of ownership to Rosanna Gironda (Wendy Dietzel's alias) and Sam Zanca. In the car were identification papers, including passport applications, for a man with several aliases, including Sam Zanca, Timothy Vahanian, and John Ronck. Also found in the car were several safe deposit keys. Two days later, with Dietzel's consent, a DEA agent opened one safe deposit box at the Bank of America in San Francisco and found 650 grams of uncut heroin. That safe deposit box had been rented in 1988 to Rosanna Gironda and Sam Zanca with a residence address on Rausch Street in San Francisco.

A month later, in September 1988, defendant was stopped by a customs official at the Vancouver airport, because he had two airline tickets in his possession, one in the name of David Johnson and another in the name of S. Zanca. Defendant also had fresh-looking scars on his face and did not look like his passport photo. Canadian authorities brought defendant to the United States and turned him over to DEA agents, who arrested him on federal drug charges. Further investigation showed that Sam Zanca had a second Bank of America safe deposit box and that on the morning of October 26, 1987, (three days before Virginia Lowery's body was found) Sam Zanca signed an entrance ticket for that box.

The safe deposit box rental application by Sam Zanca, a passport application by Sam Zanca, and a check to Itel Travel signed by Sam Zanca all gave the same address on Rausch Street in San Francisco. A notebook seized from defendant contained a telephone number for David Lowery as well as a phone number for "Bill" in Mexico.

**The 1998 Renewed Murder Investigation**

In May 1998, after the discovery that defendant's fingerprints matched the fingerprints in Virginia Lowery's garage, San Francisco homicide inspectors Gordon and Cashen met with defendant at his apartment on Van Ness Avenue in San Francisco and surreptitiously tape recorded an interview with him. Defendant denied knowing anyone named Bill or being in Virginia Lowery's home. He claimed he had been living in Thailand from 1987 or 1988 until just a few months before the interview. He acknowledged owning a house on Rausch Street in San Francisco that he sold in 1988. He admitted that he had used over 20 aliases and that he had been a heroin dealer.

As part of their renewed investigation, Inspectors Gordon and Cashen requested a DNA analysis of the fingernails of Virginia Lowery, which had been clipped during the autopsy and preserved as evidence. After learning that foreign DNA was present on the fingernails, the police obtained a warrant to retrieve a sample of defendant's DNA. But when they attempted to serve the warrant they found that defendant had quit his job and moved from his San Francisco apartment. A few weeks later, the police learned that defendant was in custody in Florida, and they arranged to have defendant's DNA samples retrieved there and sent to San Francisco for testing.

3

Two independent forensic examiners conducted DNA testing of Virginia Lowery's fingernails and discovered that at least three people had contributed to the fingernail sample. Both examiners concluded that the major contributor to the mixture was male, and both examiners derived the same DNA profile for that major contributor. That DNA profile matched the DNA profile from defendant's sample, and the chances of finding someone with that DNA profile was 1 in 567 billion or less.

Defendant's address book, obtained by Florida authorities, showed an entry for David Lowery and for Jack Colevris at 966 Brussels Street.[1]  The police also obtained telephone records showing calls in 1998 from defendant's mother's phone in Massachusetts to William Lowery's son, David Lowery, and to William Lowery's number in Mexico. The police tried to contact William Lowery, then age 70, but they were informed by Lowery's attorney that he had had a stroke and would not be returning to San Francisco. A few days later, however, William Lowery voluntarily appeared at the police department for an interview. He denied knowing defendant and gave the police the names of several drug dealers he believed could have killed his wife. Later, in 2000, William Lowery underwent a conditional examination in his home in Mexico-in the presence of a district attorney and defendant's counsel. He then admitted knowing defendant.

[FN1] Jack Colevris moved into the house after Virginia Lowery's death to serve as a caretaker.

A forensic document examiner compared the signature of Sam Zanca that appeared on the safe deposit box entrance ticket for October 26, 1987, with the signatures of Sam Zanca that appeared on four other documents: two separate passport applications from 1987 (with the applicant's photograph), a statement from 1987 for a lost passport, and the 1988 safe deposit box rental agreement. The expert concluded that the same person "very probably" signed the documents.

**Alibi Defense**

William Lowery in his conditional examination provided an alibi for defendant, asserting that defendant had been visiting him in Mexico until one or two days before Lowery got the phone call about his wife's death. Lowery denied any personal involvement in his wife's murder. He testified that defendant (known to him as Sam Zanca) had come to Mexico in October 1987 to buy drugs. Lowery introduced defendant to Salvador Ramos-Padilla, a Mexican police officer who also worked as a bodyguard for a drug dealer. Lowery recalled that defendant and Ramos-Padilla played a memorable game of pool.

Ramos-Padilla also underwent a conditional examination in Mexico. He died before trial, and the transcript of his examination was admitted into evidence. Ramos-Padilla recalled a memorable game of pool with defendant that occurred in October 1987. Ramos-Padilla also recalled that defendant left William Lowery's house before the other houseguests.

Harry Banis, a friend of William Lowery and Jack Colevris, also recalled being in William Lowery's house in Mexico in October 1987. He remembered a game of pool between a Mexican police officer and one of the other houseguests. He did not remember defendant.

Jack Colevris testified that he and Harry Banis and defendant (known then as Sam) flew together to Mexico in mid-October 1987 to stay with William Lowery. Defendant played pool with a Mexican police officer and won the officer's gun in the game. Defendant left Lowery's house about a day or two before William Lowery got the telephone call about his wife's death.

William Lowery had a room in the basement off the garage at 966 Brussels Street where he socialized with his friends and transacted business involving drugs and stolen goods. His wife

4

United States District Court
For the Northern District of California

1  Virginia was not aware of what was transpiring in the basement room. Lowery testified that
2  defendant had never been in the Brussels Street house before the murder, though he did help
   Lowery load his car when Lowery returned to Mexico three months after the murder. Jack
3  Colevris, however, testified that defendant had been in Lowery's house before the murder a few
   times to have drinks and as recently as two weeks before the murder.[2]

4
5       [FN2] Virginia Lowery's niece was married on October 10, 1987, and William Lowery came
        from Mexico to attend the wedding. He returned to Mexico on October 13 (12 days prior to
6       the probable date of the murder, October 25). William Lowery and Jack Colevris both
        testified that defendant accompanied them back to Mexico.

7
8  Lowery further testified that his son David dealt drugs with defendant. Jack Colevris gave
   similar testimony. Lowery testified that in 1998 defendant came to Mexico and stayed with him.
9  Defendant told Lowery at that visit that he was wanted on a murder charge. Defendant stayed
   about a month with Lowery and then left for Florida to get a boat to Thailand.

10
11 As part of his defense, defendant presented expert witnesses to refute the prosecution's experts
   on DNA, fingerprints, and handwriting evidence.

12 *Nawi*, 2004 WL 2944016, *1-4.

13

14                              **STANDARD OF REVIEW**

15      Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court

16 may grant a writ of habeas corpus if the

17      adjudication of the claim (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as determined by the
18      Supreme Court of the United States; or (2) resulted in a decision that was based on an
        unreasonable determination of the facts in light of the evidence presented in the State
19      court proceeding.

20 28 U.S.C. § 2254(d).

21      A decision is contrary to established law if it applies a rule that contradicts the law as set forth

22 by the Supreme Court, or arrives at a different result in a case that is "materially indistinguishable" from

23 a Supreme Court decision. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).   Unreasonable application of

24 established law occurs when the court "correctly identifies the governing legal rule but applies it

25 unreasonably to the facts." *Id.*   Under AEDPA, although Supreme Court precedent is the only

26 controlling authority, Ninth Circuit case law is persuasive authority for the purposes of review of

27 previous state court decisions. *See Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir. 2002), *amended by* 311

28 F.3d 928 (9th Cir. 2002).

In reviewing a habeas corpus petition, a federal court should look at the last reasoned decision of the state court to determine whether that court's decision was contrary to or an unreasonable application of established federal law.  *Id.* at 960-61.  However, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning. . . . Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## DISCUSSION

Petitioner raises six claims in his petition for writ of habeas corpus: (1) the prosecutor engaged in prejudicial misconduct; (2) petitioner received ineffective assistance of counsel on his direct appeal; (3) petitioner's Sixth and Fourteenth Amendment rights to confrontation were violated; (4) admission of the type of statistical DNA evidence in this case violated petitioner's right to due process of law; (5) admission of DNA evidence was irrelevant, extremely prejudicial and denied petitioner due process of law; and (6) the effect of cumulative error requires reversal of petitioner's conviction and sentencing.

## I.      Prejudicial Prosecutorial Misconduct

Petitioner contends that the prosecutor, while cross-examining alibi witness Jack Colevris, intentionally engaged in prejudicial misconduct when asking Colevris if petitioner had ever revealed that he had been segregated in prison for killing someone.

The appropriate standard of review in determining prosecutorial misconduct in federal habeas corpus is the narrow one of due process and not the broad exercise of supervisory power.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *See id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial

with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) That unfairness is measured by whether the error had substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

During trial on June 21, 2001, defense counsel asked the trial court to direct the prosecutor to approach the bench to argue any matters pertaining to crimes for which the defendant was not currently on trial to avoid prejudicing the jury.  RT 12048.  Over one month later, on July 31, 2001, during the prosecutor's cross examination of Jack Colevris, the following occurred:

> Q.     [PROSECUTOR]: In 1998 you met Bill, you met Bob Nawi at the Four Aces Bar.
>
> A.     [COLEVRIS]: (Moves head up and down.)
>
> Q.     Bob Nawi calls you, tells you he is coming out to San Francisco.  You make arrangements, you meet him at a bar here off of Taraval or on Taraval.
>
> A.     I made the arrangements.
>
> Q.     Okay. At the 4 Aces Bar, right?
>
> A.     Right.
>
> Q.     This is near your house?
>
> A.     Right.
>
> Q.     You are talking about social things, right?
>
> A.     Right.
>
> Q.     You are talking about prison?
>
> A.     No.
>
> Q.     Bob Nawi tells you that in prison, he was segregated for killing somebody.
>
> [DEFENSE COUNSEL]: Judge, I'll object.
>
> The Court: Sustained, sustained.
>
> [DEFENSE COUNSEL]: Move for a mistrial at this point.
>
> The Court: Motion is denied.
>
> [DEFENSE COUNSEL]: He knows it's outrageous.
>
> [PROSECUTION]: That's not --
>
> The Court: Members of the jury, a question is not evidence. The objection is sustained.  The

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

1    jurors are to disregard the question.

2    RT 14865-66; *see also* FAP at 86-87.

3    During a recess, the defense counsel pressed for a mistrial. The court denied the request, but

4    reminded the prosecutor that attorneys were ordered to approach the bench before pursuing questioning

5    pertaining to other crimes. The judge held that the prosecutor's conduct was improper, but that "there

6    was no harm in the sense that the question was asked, the court stepped in right away when Mr. Burt

7    raised the objection, sustained the objection before Mr. Colevris was able to give an answer. . . . most

8    importantly, the court again told the jury that a question is not evidence" and to disregard the question.

9    RT 14876-77.

10    Given that the prosecutor's remarks were held to be improper, the first factor in determining if

11    misconduct amounted to a violation of due process is whether the trial court issued a curative

12    instruction. When a curative instruction is issued, a court presumes that the jury has disregarded

13    inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S. 756,

14    766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by

15    the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); *Tan*,

16    413 F.3d at 1115 ("we presume jurors follow the court's instructions absent extraordinary

17    circumstances"). This presumption may be overcome if there is an "overwhelming probability" that the

18    jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct

19    would be "devastating" to the defendant. *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16

20    (finding trial fair where jury received instructions five different times to consider only the evidence

21    presented, and not its sympathy for the victim's life story). Petitioner claims that "we all live in a

22    dreamworld" if we believe that jurors can disregard a prejudicial statement from a prosecutor about an

23    unrelated killing without it playing a role in their decision; however the ability of jurors do just that in

24    response to a court instruction is a tenet of our jury system. *See Tan*, 413 F.3d at 1115. We rely on

25    jurors to follow such instructions and presume them capable of perform the task with which they are

26    charged. *See id.*

27    Petitioner argues that the misconduct of the prosecutor "is not cured by the fact that the questions

28    elicit a negative answer or no answer at all," FAP at 91, and that questions like the one posed by the

prosecutor here "suggest to the jury that the prosecutor has a source of information unknown to them which corroborated the truth of the matters in question" and that "jurors were led to believe that, in fact, the insinuations in the questions were true." *Id. (citing People v. Wagner*, 13 Cal. 3d 612, 619 (1975)). While a lack of response may not be enough to remedy misconduct, the purpose of issuing curative instructions, like the one issued in this case, is to specifically combat this type of prejudice against the defendant. The California Court of Appeal noted that at the end of trial the jury was given CALJIC No. 1.02 which states:

> Statements made by the attorneys during the trial are not evidence . . . .
>
> If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection.
>
> Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer.
>
> Do not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken by the court. Treat it as though you had never heard of it.

*Nawi*, 2004 WL 2944016, at *18; *see also* RT 16102-16103.

The California Court of Appeal saw no prejudice at all, agreeing with the trial court that the trial court's instruction cured any error. *Nawi*, 2004 WL 2944016, at *18. That finding is not "contrary to," nor did it involve "an unreasonable application of" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). The question was one line in a four month trial, and the curative instruction given at the time, as well as in the jury instructions, remedied any potential prejudice. Moreover, as the California Court of Appeal found, "the evidence connecting defendant to the murder of Virginia Lowery, although circumstantial, was compelling." *Nawi*, 2004 WL 2944016, at *19. This evidence, as noted above, includes fingerprints at the scene of the crime and DNA evidence linking the defendant to material found under the victim's fingernails. The conclusions are not an unreasonable application of clearly established federal law.

## II. Ineffective Assistance of Appellate Counsel

Petitioner alleges that he received ineffective assistance due to appellate counsel's decision not to pursue claims raised by Nawi's trial attorney on the motion for a new trial, all of which were rejected

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

by the trial court.[1]  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).   First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.  A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 131 S. Ct. at 788.  Here, the answer yes.

Petitioner raised these IAC claims in his habeas petition in state court.  The Superior Court addressed and rejected them directly:

> Petitioner asserts the record supports his contention that the claims appellate counsel failed to raise during the appeal were all meritorious, but he does not develop the merits of his claim. (¶) His bald assertion that the 16 claims in the new trial motion would have been successful on direct appeal ignores that the trial court denied the new trial motion in its entirety. (¶) Similarly, his contention that the three claims omitted from the petition for

---

[1]  Specifically, Petitioner complains about appellate counsel's failure to challenge on direct appeal the following actions of the trial court: (1) denial of motion to dismiss based on precharging delay; (2) admission of fingerprint evidence; (3) failure to exclude DNA evidence; (4) exclusion of handwriting evidence; (5) denial of motion for mistrial or motions for curative instructions regarding other crimes evidence; (6) denial of motions for mistrial based on judicial misconduct; (7) motion for mistrial based on prejudicial spectator courtroom outburst; (8) denial of the constitutional right to put on a defense; (9) denial of motion to grant judicial use of immunity; (10) denial of motions to suppress evidence; (11) allowing assertion of a theory of the case that has been disavowed in pretrial proceedings; (12) misdirection of the jury in matters of law and erroneous refusal to give requested instructions; (13) failure to dismiss based on insufficient evidence to sustain a finding of guilt for murder; (14) order for new trial because there was no evidence to support prosecutor's theory of the case; and (15) order for new trial because new evidence was discovered that was highly material to the defense.  Petitioner also complains about appellate counsel's failure to raise three claims on petition for review by the California Supreme Court: (1) flight instruction; (2) juror misconduct; and (3) cumulative error.

Supreme Court review had merit neglects that the First District Court of Appeal considered these claims and affirmed the judgment. (¶) The argument also refuses to take notice of the longstanding general rule that "issues resolved on appeal will not be reconsidered on habeas corpus." The First District Court of Appeal ruled against Petitioner on these three claims. He cannot now on habeas corpus claim that they have merit. (¶) Considering the claims in question were previously rejected, the circumstances do not reasonably suggest that appellate counsel was incompetent in failing to raise these claims, or that this resulted in a fundamentally unfair proceeding. (¶) By contrast, appellate counsel's decision not to pursue these claims seems to have been a reasonable, knowled[g]able tactical decision that did not deny petitioner effective assistance of counsel.

FAP, Ex. B at 3-4.

The state court's decision is not "contrary to" or an "unreasonable application" of clearly established federal law.[2] *Strickland* allows counsel to "make a reasonable decision" that raising particular claims is unnecessary. *See Strickland*, 466 U.S. at 691; *Pinholster*, 131 S. Ct. 1407; *Turner*, 158 F.3d at 456. It is also important to note that appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Keeney*, 882 F.2d at 1434 n.10. The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *See id.* at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason—because he declined to raise a weak issue. *Id.*

Here, as to each of the issues Petitioner asserts appellate counsel should have raised, a "reasonable argument" exists supporting the state court's determination that appellate counsel likely made tactical decisions to forego those claims in the appellate process. For example, appellate counsel could have made a reasonable tactical decision not to raise the precharge delay issue on appeal because the trial court found that the delay was justified by the fact that, through no fault of the police or

---

[2] Petitioner also argues that the Superior Court's order was "contrary to" federal law because appellate counsel never stated her reasons for omitting the challenged claims on appeal. FAP 306. However, as has been made abundantly clear, the question this Court needs to determine is whether there are "any reasonable grounds" to support the California Superior Court's determination that appellate counsel made appropriate tactical decisions in declining to raise the issues and, in this case, there are. *See Richter* 131 S. Ct. at 788. Petitioner's challenge to the fact that the state appellate and supreme courts issued summary denials of his habeas petitions is likewise misguided. The summary denials do not change the standard of review to be applied by this Court's under Section 2254. *Id.* at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas' petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

prosecution, DNA evidence was not secured from Petitioner until close to the date he was charged.  *See* RT 7010-12.  That issue, therefore, could reasonably be seen as one that would not lead to a reversal of Petitioner's conviction**.**  *See, e.g.*, *United States v. Lavasco*, 431 U.S. 783, 789 (1977) ("the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused" ); *see also People v. Nelson*, 185 P.3d 49, 55 (Cal. 2008) (prosecution may offer justification for delay, that justification is balanced against any prejudice to the defendant, and there is a strong justification for delay in light of the fact that there is no statute of limitations for murder).

As another example, appellate counsel could have made a reasonable tactical decision not to challenge as error the denial of Petitioner's motion to exclude the DNA evidence because of destructive testing of the fingernail scrapings.  The Supreme Court has made clear that, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. " *California v. Trombetta*, 467 U.S. 479, 488-89. (1984)(constitutional materiality requires that evidence possess exculpatory value apparent before its destruction); *see also Arizona v. Youngblood*, 488 U.S. 51, 56 n.* (1998)(there must be more than the mere possibility of exculpatory value to require that the prosecution preserve it).  The issue could reasonably be seen as one that would not lead to the reversal of Petitioner's conviction.

It is also important to note that appellate counsel did raise significant claims in both the direct appeal and petition for review.  On direct appeal, appellate counsel raised ten claims in a 249-page opening brief.  *See* Docket No. 25 at p 7-13.  The claims raised included abuse of discretion in admitting DNA evidence, inadmissibility of statistical DNA analysis, reversible error for failure to give desired instructions, prejudicial prosecutorial misconduct, and admission of hearsay.  *Id*.   On Petition for review, appellate counsel raised five claims including reversible error for admission of statistical probability evidence, the use of incorrect scientific procedures in testing DNA, relying on unreliable expert opinion in absence of *Kelly/Frye* hearings, prosecutorial misconduct, and denial of confrontation clause rights**.**  *See* Docket No. 24-3 p. 3-4.  Appellate counsel appears to have thoroughly presented the claims she thought were strongest and/or best suited for success on direct appeal and review.  Reviewing the Petition, as well as the record and the Superior Court's decision, the Court cannot say that there is no "reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Richter*, 131 S. Ct.

at 788.

**III.     Violation of Confrontation Clause or Due Process**

Petitioner Nawi alleges that he was denied his right to confrontation, in accordance with the Sixth and Fourteenth Amendments, when the trial court admitted hearsay evidence that David Lowery told housekeeper Luz Gutierrez the day before Virginia Lowery's body was found that she had been killed. Nawi argued against allowing the testimony before Gutierrez was presented to the jury. The trial court conducted a hearing and concluded that her statements were admissible for the non-hearsay purpose of establishing David Lowery's knowledge that his step-mother was dead one day before the body was discovered. The trial court instructed the jury to consider the statement only for the limited purpose of showing David Lowery's knowledge, not to prove that Virginia Lowery had been killed.

The California Court of Appeals considered this claim and found no error in the trial court's ruling:

> The statements were not hearsay. They were not introduced to prove the truth of the mater stated, i.e., that Virginia Lowery had been killed. The prosecution introduced copious other evidence to establish the killing. Instead, David Lowery's statements were admitted to show that he knew about the murder even before the police discovered the body. Statements tending to prove the declarant's guilty knowledge are not hearsay.

*Nawi*, 2004 WL 2944016, at *17.

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, *i.e.*, "testimonial hearsay." *See Crawford v. Washington*, 541 U.S. 36, 51 (2004). The statements by Gutierrez were allowed for evidence of David Lowery's knowledge, not for the truth of the matter asserted by the statements. "[T]he admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011).

Petitioner also argues that admission of the testimony violated his due process rights because it was so irrelevant and prejudicial so that it rendered the trial unfair. However, the Court of Appeal specifically found that the "statements were relevant to the prosecution's theory of motive" in the case and properly admitted. *Nawi*, 2004 WL 2944016, at *17; *see also Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on

United States District Court
For the Northern District of California

1   an evidentiary decision."); *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (evidentiary

2   admissions can only violate due process "if there are *no* permissible inferences the jury may draw from

3   the evidence") (emphasis in original); *Windham v. Merkle*, 163 F.3d 1092, 1103-04 (9th Cir. 1998)

4   (evidence used to advance "gang involvement theory" was not violative of due process).

5      The California Court of Appeals decision on this issue was not contrary to or an unreasonable

6   application of clearly established federal law.

7

8   **IV.  Statistical Probability Related to DNA Evidence**

9      Nawi alleges that the trial court's admission of DNA probability statistics violated his right to due

10  process because the statistics were compiled only from a Caucasian database, and were therefore

11  irrelevant.  The California Court of Appeal rejected Nawi's claim:

12    Defendant complains that the experts improperly used only a Caucasian database in determining
      the frequency with which the DNA profile of the major contributor would occur.  Defendant

13    contends that limiting the database to the Caucasian population (because defendant is Caucasian)
      erroneously presumed the defendant was the DNA contributor.

14    The record does not support defendant's assertion that the experts used only a Caucasian
      database.

15  *Nawi*, 2004 WL 2944016, at *15.  The opinion went on to cite the reports of and testimony from the DNA

16  experts reflecting their use of various databases, including profiles of "200 whites, 200 Blacks and 200

17  Hispanics," which reflected "the statistical frequency of the genotypes in each of the three population

18  groups."  *Id.*  At trial, one of the experts "was asked about and used the figure for the Caucasian

19  population, presumably because that figure was the most conservative, i.e., the most favorable to the

20  defendant," but the written reports reflect the broader population groups.  *Id.*

21     The California Court of Appeal then examined expert testimony and the report on the DNA

22  testing process supporting its view that the statistical calculations were not limited to the Caucasian

23  population.  *Id.*  The Court of Appeal concluded:

24    [T]here is no basis for defendant's assertion that the expert testimony on statistical probability
      presumed that the perpetrator was Caucasian or that defendant was the perpetrator.  Nor is there

25    any validity to defendant's contention that the prosecutor referred in closing argument to the
      statistical probabilities among Caucasians.  The prosecutor made no mention of a racial group.

26  *Id.*

27

28     Petitioner does not show that the trial court's admission of DNA evidence or the Court of

14

**United States District Court**
For the Northern District of California

1   Appeal's decision affirming such use is contrary to or an unreasonable application of federal law. It is

2   certainly true that irrelevant evidence is inadmissible, and that "[e]vidence is considered irrelevant if it

3   fails to make any fact of consequence more or less probable." *McKinney v. Rees*, 993 F.3d 1378, 1380

4   (9th Cir. 1993).   It is also true that "[i]rrelevant evidence may merely be a waste of time, may confuse

5   the jury, or may cause serious prejudice to the defense." *Id.*  However, petitioner has not demonstrated

6   that the DNA statistical evidence was indeed irrelevant, much less prejudicial.

7        Petitioner relies on California law to argue that admission of DNA testimony at trial which was

8   limited to comparison of Caucasians only was improper and irrelevant and, therefore, violated his rights

9   to presumption of innocence, citing *People v. Pizarro*, 110 Cal. App. 4th 520 (2003) which held that "in

10  the absence of sufficient evidence of the perpetrator's ethnicity, any particular ethnic frequency is

11  irrelevant." *Pizarro*, 110 Cal. App. 4th at 632.

12       However, Petitioner's Caucasian-only argument is contrary to the facts adduced at trial, as

13  recounted by the Court of Appeal in its opinion.  Moreover, the California Supreme Court has held that

14  expert testimony on profiling frequencies for the three most common population groups of DNA evidence

15  is admissible even in absence of evidence of the perpetrator's ethnicity.  *See People v. Wilson*, 38 Cal.

16  4th at 1237 (2006) ("It is relevant for the jury to know that most persons of at least major portions of the

17  general population could not have left the evidence samples.").  The expert's reports, submitted at trial,

18  here compared Petitioner's DNA to at least three different racial groups. CT 4650-4657; CT 4656 n.1.

19       The question here, is whether there are *any grounds* that would reasonably support the California

20  Court of Appeal's holding and decisions of the California courts to deny state habeas relief. Under the

21  very deferential standard of review this Court must apply, the Court finds it reasonable that the

22  prosecution's experts testified in trial as to only the most conservative DNA results, as opposed to the

23  broader results described in their reports. This did not violate Petitioner's due process rights. *See*

24  *McDaniel*, 130 S. Ct. at 673; *Wilson*, 38 Cal. 4th at 1244.  The California Court of Appeals decision was

25  not contrary to or an unreasonable application of clearly established federal law.

26

27  **V.      Speculative Nature of DNA Evidence**

28       Nawi alleges that under the facts of this case, the DNA evidence was too speculative to be

15

1   relevant to the issue of the identify of the killer and should have been excluded.  The California Court

2   of Appeal rejected Nawi's claim:

> We reject defendant's premise that the DNA evidence was speculative.  The DNA evidence
> included more than the mere presence of defendant's DNA at the murder scene.  First, the amount
> of defendant's DNA in proportion to other DNA contributors made him a major contributor,
> overwhelming even the victim's own DNA.  Keel testified that it was not likely the DNA on
> Virginia Lowery's fingernails came from cleaning or touching furniture.  Further, the DNA was
> found on the victim's fingernails and there was other evidence that Virginia had a penchant for
> cleanliness.  Although no scientific measurement was available to detect exactly when the DNA
> was left on the fingernails, the evidence concerning the quantity and location permitted a
> reasonable inference that the DNA was left at the time of the murder.  Keel ventured the opinion
> that Virginia Lowery's fingers might have gone into defendant's mouth and defendant's DNA
> could have come from his saliva.  The connection between the DNA evidence and the murder was
> circumstantial, but it was not speculative.  The evidence was properly admitted for the jury's
> consideration.

10   *Nawi*, 2004 WL 2944016, at *48-49 (footnotes omitted)**.**

11          Petitioner argues that the jury could have drawn the conclusions that his DNA was deposited on

12   Virginia Lowery's fingernails at the time of the murder "[o]nly by guesswork, speculation, or conjecture"

13   and that the evidence should thus be inadmissible.  *Brit v. Superior Court*, 34 Cal. App. 3d 934, 938

14   (1973).  But, as the California Court of Appeal held, the "quantity and location" of the DNA evidence

15   permits such inferences.  *Nawi*, 2004 WL 2944016, at *16; *see also Jammal*, 926 F.2d 918, 920

16   (evidentiary admissions can only violate due process "if there are *no* permissible inferences the jury may

17   draw from the evidence").  Unlike the *Brit* case, testimony placed Nawi in San Francisco around the time

18   the murder occurred, and the location and quantity of the DNA evidence permits the inference that the

19   victims fingers may have entered Nawi's mouth.  The California Court of Appeals decision was not

20   contrary to or an unreasonable application of clearly established federal law.

21

22   **VI.     Cumulative Error**

23          In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the

24   cumulative effect of several errors may still prejudice a defendant so much that his conviction must be

25   overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where

26   multiple constitutional errors hindered defendant's efforts to challenge every important element of proof

27   offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002) (reversing

28   conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing

**United States District Court**
For the Northern District of California

16

only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness).

Cumulative error is more likely to be found prejudicial when the government's case is weak. *See, e.g., Thomas*, 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime); *Walker v. Engle*, 703 F.2d 959, 961-62, 968 (6th Cir.), *cert. denied*, 464 U.S. 951 (1983). However, where there is no single constitutional error existing, as has been found in Nawi's case, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

## CONCLUSION

For the foregoing reasons and good cause shown, the Court DENIES petitioner's petition for writ of habeas corpus.

**IT IS SO ORDERED.**

Dated: August 23, 2011

SUSAN ILLSTON
United States District Judge